**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of THE TRADE DESK, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JEFF GREEN, LAURA SCHENKEIN, LISE J. BUYER, ANDY CUNNINGHAM, KATE FALBERG, GOKUL RAJARAM, DAVID B. WELLS, and SAMANTHA JACOBSON, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| THE TRADE DESK, INC., | |
| Nominal Defendant. | |

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Hugues Gervat ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant The Trade Desk, Inc. ("Trade Desk" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Trade Desk, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *In re Trade Desk, Inc. Securities Litigation, et al.*, Case No. 2:25-cv-01396-CAS-DFM (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Trade Desk against certain officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties and violations of the federal securities laws between at least May 9, 2024 and February 12, 2025, inclusive (the "Relevant Period").

2.     Trade Desk is a global technology company that offers a self-service, cloud-based ad-buying platform that allows its clients to plan, manage, optimize, and measure

---

[1] The Individual Defendants are Jeff Green ("Green"), Laura Schenkein ("Schenkein"), Lise J. Buyer ("Buyer"), Andy Cunningham ("Cunningham"), Kate Falberg ("Falberg"), Gokul Rajaram ("Rajaram"), David B. Wells ("Wells"), and Samantha Jacobson ("Jacobson"). The Individual Defendants, together with Trade Desk, are herein referred to as "Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

data-driven digital advertising campaigns. The Company's platform allows clients to execute integrated campaigns across ad formats and channels, including connected television ("CTV") and other video, display, audio, and native formats, on a variety of devices — including televisions, streaming devices, mobile devices, computers, and more.

3. Before the Relevant Period, on June 6, 2023, the Company launched "Kokai," a generative artificial intelligence ("AI") forecasting tool that allows users to more effectively deploy advertisement campaigns. The Company highlighted Kokai as a "major advancement in programmatic AI" and stated that it provided access to "more than 13 million advertising impressions every second."

4. After launching Kokai, the Company began to transition its clients from its old platform, Solimar, to Kokai. Defendant Green highlighted the transition to Kokai as the "largest platform overhaul in our company's history." Trade Desk assured investors that the client transition would be "without [] disruption" and that Kokai would be fully rolled out over the course of 2024.

5. As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the value of Kokai to the Company and its clients, highlighting the positive impact Kokai would have on the Company's financial prospects.

6. However, the truth was revealed on February 12, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, the Company revealed that Trade Desk's revenue for the fourth quarter of 2024 was $741 million, which was $15 million below the Company's previously provided guidance of $756 million, and $18.8 million below analysts' estimates of $759.8 million. The 4Q24 Earnings Release also revealed that the Company's revenue guidance for the first quarter of 2025 was at least $575 million, which was approximately $6 million lower than analysts' estimates of $581.5 million.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

7.    During an earnings call the same day (the "4Q24 Earnings Call"), Defendant Green also revealed that the Company had not yet reached full adoption of Kokai, stating that the Company was "maintaining 2 systems, Solimar and Kokai. This slows us down," that "Kokai rolled out slower than we anticipated," and that "in some cases, the slower Kokai rollout was deliberate."

8.    On this news, Trade Desk's stock price fell $40.31 per share, or nearly 33%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

9.    As set forth herein, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material fact to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing significant difficulties in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial  prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10.    Furthermore, the Individual Defendants breached their fiduciary duties by causing Trade Desk to repurchase its own stock at artificially inflated prices due to the foregoing misrepresentations during the Relevant Period.

11.    As a result of the foregoing, on February 19, 2025, the Securities Class Action was filed against the Company as well as Defendants Green and Schenkein in the United States District Court for the Central District of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

12.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and SEC Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Trade Desk is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# **PARTIES**

*Plaintiff*

18.　Plaintiff is, and has been at all relevant times, a continuous shareholder of Trade Desk.

*Nominal Defendant*

19.　Nominal Defendant Trade Desk is a Nevada corporation with its principal executive offices located at 42 N. Chestnut Street, Ventura, California 93001. Trade Desk's common stock is traded on the NASDAQ under the ticker symbol "TTD."

*Individual Defendants*

20.　**Defendant Green** is a co-founder of the Company and has served as the Company's President and Chief Executive Officer, and as Chairman of the Board since November 2009. In addition, Defendant Green is the controlling shareholder of the Company. According to the proxy statement filed on Schedule 14A with the SEC on April 9, 2025 (the "2025 Proxy Statement"), as of February 28, 2025, Defendant Green beneficially owned 4,456,258 shares of the Company's common stock.

21.　Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Green owned approximately $313,364,062 worth of Trade Desk stock.

22.　For the 2024 Fiscal Year, Defendant Green received $6,756,299 in total compensation from the Company.

23.　**Defendant Schenkein** served as Chief Financial Officer of the Company from June 2023 to August 2025. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Schenkein beneficially owned 917,478 shares of the Company's common stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.　　Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Schenkein owned approximately $64,517,052 worth of Trade Desk stock.

25.　　For the 2024 Fiscal Year, Defendant Schenkein received $11,663,800 in total compensation from the Company.

26.　　**Defendant Buyer** has served as a director of the Company since March 2019 and as Lead Independent Director of the Company since February 2021. Defendant Buyer also serves as Chair of the Company's Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Buyer beneficially owned 144,897 shares of the Company's common stock.

27.　　Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Buyer owned approximately $10,189,157 worth of Trade Desk stock.

28.　　For the 2024 Fiscal Year, Defendant Buyer received $427,223 in total compensation from the Company.

29.　　**Defendant Cunningham** has served as a director of the Company since January 2022. Defendant Cunningham also serves as a member of the Company's Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Cunningham beneficially owned 17,515 shares of the Company's common stock.

30.　　Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Cunningham owned approximately $1,231,654 worth of Trade Desk stock.

31.　　For the 2024 Fiscal Year, Defendant Cunningham received $355,901 in total compensation from the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

32. **Defendant Falberg** has served as a director of the Company since August 2016. Falberg also serves as Chair of the Company's Compensation Committee and the Audit Committee. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Falberg beneficially owned 146,910 shares of the Company's common stock.

33. Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Falberg owned approximately $10,330,711 worth of Trade Desk stock.

34. For the 2024 Fiscal Year, Defendant Falberg received $400,009 in total compensation from the Company.

35. **Defendant Rajaram** has served as a director of the Company since May 2018. Rajaram also serves as a member of the Company's Audit Committee and Compensation Committee. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Rajaram beneficially owned 28,636 shares of the Company's common stock.

36. Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Rajaram owned approximately $2,013,683.52 worth of Trade Desk stock.

37. For the 2024 Fiscal Year, Defendant Rajaram received $372,509 in total compensation from the Company.

38. **Defendant Wells** served as a director of the Company from December 2015 to May 2025. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Wells beneficially owned 95,623 shares of the Company's common stock.

39. Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Wells owned approximately $6,724,209 worth of Trade Desk stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

40.     For the 2024 Fiscal Year, Defendant Wells received $410,009 in total compensation from the Company.

41.     **Defendant Jacobson** has served as Chief Strategy Officer of the Company since February 2022, and as a director of the Company since January 2024. According to the 2025 Proxy Statement, as of February 28, 2025, Defendant Jacobson beneficially owned 69,843 shares of the Company's common stock.

42.     Given that the price per share of the Company's common stock at the close of trading on February 28, 2025 was $70.32, Defendant Jacobson owned approximately $4,911,359 worth of Trade Desk stock.

43.     For the 2024 Fiscal Year, Defendant Jacobson received $11,662,963 in total compensation from the Company.

44.     **Non-Party Director Alex Kayyal** has served as a Chief Financial Officer of the Company since August 2025 and as a director of the Company since February 2025.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45.     By reason of their positions as officers and/or directors of Trade Desk, and because of their ability to control the business and corporate affairs of Trade Desk, the Individual Defendants owed Trade Desk and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Trade Desk in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Trade Desk and its shareholders.

46.     Each director and officer of the Company owes to Trade Desk and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Trade Desk, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of Trade Desk were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Trade Desk, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

50.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

51.     To discharge their duties, the officers and directors of Trade Desk were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Trade Desk were required to, among other things:

a.  Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California and the United States, and pursuant to Trade Desk's own Code of Conduct and Ethics (the "Code of Conduct");

b.  Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  Remain informed as to how Trade Desk conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d.  Establish and maintain systematic and accurate records and reports of the business and internal affairs of Trade Desk and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.  Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Trade Desk's operations would comply with all applicable laws and Trade Desk's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

    f.   Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

    g.   Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

    h.   Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.    Each of the Individual Defendants further owed to Trade Desk and the shareholders the duty of loyalty requiring that each favor Trade Desk's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

53.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Trade Desk and were at all times, acting within the course and scope of such agency.

54.    Because of their advisory, executive, managerial, and directorial positions with Trade Desk, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Trade Desk.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

58.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

59.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Trade Desk, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Trade Desk and at all times acted within the course and scope of such agency.

## TRADE DESK'S CODE OF CONDUCT

62.    Trade Desk's Code of Conduct states that it applies to the Company's "directors, officers and employees."

63.    With respect to "Conflicts of Interest," the Code of Conduct states, in part:

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Chief Financial Officer or General Counsel.

This Code does not attempt to describe all possible conflicts of interest that may develop. Other common conflicts of interest from which Covered Parties must refrain include:

- Covered Parties may not engage in any conduct or activities that are inconsistent with the Company's best interests or that disrupt or impair the Company's relationship with any person or entity with which the Company has or proposes to enter into a business or contractual relationship.
- Covered Parties may not accept compensation, in any form, for services performed for the Company from any source other than the Company.
- No Covered Party may take up any management or other employment position with, or have any material interest in, any firm or company that is in direct or indirect competition with the Company.

64.    With respect to "Disclosures," the Code of Conduct provides:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

65.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

The Company is obligated to comply with all applicable laws, rules and regulations.  It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

66.     In a section titled "Reporting, Accountability and Enforcement," the Code of Conduct provides, in relevant part:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to their supervisor, or directly to the Company's Chief Financial Officer or General Counsel. . . .

## TRADE DESK'S AUDIT COMMITTEE CHARTER

67.    Pursuant to Trade Desk's Audit Committee Charter, the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

68.    The Audit Committee Charter lays out the following "Duties and Responsibilities" of the Audit Committee:

*Interaction with the Independent Auditor*

1.    *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

2.    *Annual Report on Independence*. The Committee must ensure that the independent auditor prepares and delivers, at least annually, a written statement delineating all relationships between the independent auditor and the Company, must actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditor, and, if the Committee determines that further inquiry is

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

advisable, must take appropriate action in response to the independent auditor's report to satisfy itself of the auditor's independence.

*Annual Financial Statements and Annual Audit*

3.    *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.    *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.    *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6.    *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7.    *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.    *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

9.    *Complaint Procedures*. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10. *Reports to the Board of Directors*. The Committee must report regularly to the Board regarding the activities of the Committee.

11. *Committee Self-Evaluation*. The Committee must periodically perform an evaluation of the performance of the Committee.

12. *Review of this Charter*. The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

13. *Review of Related Person Transactions*. The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved by the Committee.

14. *Review of Code of Ethics*. The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Conduct and Ethics and the procedures in place to enforce the Code of Conduct and Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Conduct and Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

## SUBSTANTIVE ALLEGATIONS

### *Background*

69. Trade Desk is a global technology company that offers a self-service, cloud-based ad-buying platform that allows its clients to plan, manage, optimize, and ensure data-driven digital advertising campaigns. The Company's platform allows clients to execute integrated campaigns across ad formats and channels, including CTV and other video, display, audio, and native formats, on a variety of devices, including televisions, streaming devices, mobile devices, computers, and more.

70. Before the Relevant Period, on June 6, 2023, the Company launched Kokai, a generative AI forecasting tool that allows users to more effectively deploy advertising spending. In the press release announcing the launch of Kokai, Trade Desk stated that Kokai's capabilities included "predictive clearing, which ensures traders make bids at the optimal level; scoring every ad impression based on relevance to the advertiser; upgrading

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

measurement and forecasting; increasing resilience, even in the absence of identifiers; budget optimization; and KPI [key performance indicator] scoring."[2]

71.    In this press release, the Company highlighted Kokai as being a "major advancement in programmatic AI" and stated that it provided access to "more than 13 million advertising impressions every second."

72.    After launching Kokai, the Company began transitioning its clients from its old platform, Solimar, to Kokai. Defendant Green highlighted the transition to Kokai as the "largest platform overhaul in our company's history." The Company also assured investors that the client transition would be "without [] disruption" and that Kokai would be fully rolled out over the course of 2024.

73.    As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly touted the value of Kokai to the Company and its clients, highlighting the positive impact Kokai would have on the Company's financial prospects.

***The Individual Defendants' False and Misleading Statements***

74.    On May 8, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). In the 1Q24 Earnings Release, the Company reported revenue of $491 million for the first quarter, representing growth of 28% year-over-year. In the 1Q24 Earnings Release, Defendant Green was quoted as stating:

> Q1 was a strong quarter for The Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year. Our outstanding performance to start the year underlines the value advertisers are placing on premium inventory on the open internet[.] With the continued strong growth of CTV, the growing ubiquity of UID2, new approaches to authentication,

---

[2] *See The Trade Desk Launches Kokai — A New Media Buying Platform That Brings the Full Power of AI to Digital Marketing*, The Trade Desk, Inc. (June 6, 2023), https://www.thetradedesk.com/us/news/press-room/the-trade-desk-launches-kokai-anew-media-buying-platform-that-brings-the-full-power-of-ai-to-digital-marketing.

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

greater deployment of first-party data and retail data, and with significant AI advances in our Kokai platform, we are better positioned than ever to deliver premium value to advertisers and continue to gain market share.

75. On the same day, Trade Desk hosted an earnings call for investors and analysts to discuss the financial results for the first quarter of 2024 ("1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Green attributed the Company's revenue growth to the rollout of Kokai, stating, in relevant part, "I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai." Defendant Green went on to highlight Kokai's capabilities, stating, in relevant part:

> [A]nd the innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising TAM [total addressable market].

76. During the 1Q24 Earnings Call, Defendant Schenkein also highlighted Kokai's role in the Company's growth, stating, in relevant part "All of our progress in areas such as CTV, Retail Media, *Kokai* and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024." (Emphasis added).

77. On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). In the 2Q24 Earnings Release, Trade Desk reported revenue of $585 million for the second quarter of 2024, representing a 26% increase year-over-year. Defendant Green was quoted in the 2Q24 Earnings Release as stating, in relevant part:

> We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. As Kokai ramps, we're

intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.

78.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Green touted Kokai's functionality, stating, in relevant part:

> In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium open Internet where consumers are most leaned in, *after years of development, we launched our most ambitious platform to date, Kokai.* Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers. Kokai helps them target those new audiences across the many thousands of destinations that comprise the best of the open Internet.
>
> And it leverages AI to help them make sense of the roughly 15 million ad opportunities we see every second and the hundreds of variables associated with each one of them. And all of this happens in the context of what any given client's unique business growth goals are. *I've been incredibly encouraged by the early results from Kokai.* For those campaigns that have moved from Solimar to Kokai in aggregate, incremental reach is up more than 70%.
>
> Cost per acquisition has improved by about 27% as data elements per impression have gone up by about 30%. In addition, performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come. So, our clients are getting more precise, more cost-efficient, and then they're able to reinvest for even more reach and drive a much better return on ad spend. Given everything I said about what CMOs [chief marketing officers] today are trying to accomplish and the pressures

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that they are under, ***I firmly believe that we have met the moment with Kokai***.

(Emphasis added).

79. On October 3, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement solicited shareholders to approve the reincorporation of the Company from the State of Delaware to the State of Nevada.

80. The Individual Defendants, through the 2024 Proxy Statement, expressed their frustrations with the Delaware legal regime and shared their perception that "[t]he increasingly litigious environment facing corporations with controlling shareholders [in Delaware] has created unpredictability in decision-making and has started to impede our ability to act quickly."

81. The Individual Defendants further shared their perception that reincorporation in Nevada would:

> result in less unmeritorious litigation against the corporation and our directors and officers, which in turn better allow our directors and officers to focus on the business and save the Company the costs of such litigation . . . [W]e believe Nevada strikes a better balance between costs of litigation to the Company and its stockholders than does Delaware because Nevada has a statute-focused approach to corporate law whereas Delaware's approach depends upon judicial interpretation that lends itself to greater uncertainty.

82. The Individual Defendants further shared their negative perception of Delaware General Corporation Law ("DGCL") and their perceived strengths of the Nevada Revised Statutes ("NRS"), stating:

> The DGCL precludes liability limitation for directors and executive officers for breach of the duty of loyalty, acts or omissions not in good faith or involving intentional misconduct and for paying dividends or repurchasing

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock out of other than lawfully available funds. Under the NRS, in order for a director or officer to be individually liable to the corporation or its stockholders or creditors for damages as a result of any act or failure to act, the presumption of the business judgment rule must be rebutted and it must be proven that the director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as a director or officer and that the breach of those duties involved intentional misconduct, fraud or a knowing violation of law. Unlike the DGCL, however, the limitation on director and officer liability under the NRS does not treat as categorically excluded from its protections breaches of the duty of loyalty or transactions from which a director derives an improper personal benefit. Personal liability of directors for distributions made in violation of the NRS is limited by the same standard.

83.     The Individual Defendants further disclosed that as of the date that the 2024 Proxy Statement was issued, the Company faced a consolidated stockholder derivative lawsuit, which alleged claims against the Board for breach of their fiduciary duties in connection with the negotiation and approval of Defendant Green's executive compensation. *See, In re Trade Desk, Inc. Derivative Litigation*, Case No. 2022-0461 (Del.).[3] The 2024 Proxy Statement informed shareholders that reincorporation to Nevada would result in less "unmeritorious litigation" against the Company, the Board, and Defendant Green specifically.

84.     The 2024 Proxy Statement further states that the Company's success would not have been possible without the "foresight and strategic decisions of our visionary founder, Chief Executive Officer and controlling stockholder, [Defendant Green]." In other words, the 2024 Proxy Statement argues that the Company's successes are largely attributable to its' controlling shareholder structure, which the Individual Defendants believe is better suited to anticipate industry changes and trends —therefore

---

[3] The Delaware Supreme Court affirmed the Court of Chancery's order dismissing the claims against Trade Desk with prejudice on November 6, 2025. *In re Trade Desk, Inc. Derivative Litig.,* No. 114, 2025, 2025 WL 3113392 (Del. Nov. 6, 2025)(unpub.)

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

reincorporation to Nevada, a jurisdiction which the Individual Defendants perceive as more beneficial to controlling shareholders, would be advantageous to the Company.

85.     The 2024 Proxy Statement supports reincorporation by highlighting the Company's recent successes. In particular, the 2024 Proxy Statement highlights Kokai's supposed contribution to the Company's success, stating, in relevant part:

> Our success as a company would not have been possible without the foresight and strategic decisions of our visionary founder, Chief Executive Officer and controlling stockholder, Jeff Green. Mr. Green has become a thought leader for our industry, and has consistently guided the Company by successfully anticipating industry trends and changes and developing our strategy and products to take advantage of those opportunities. . . .Some of our strategic decisions in recent years have included, among others. . . .

> In 2023, we announced the launch of Kokai, our largest core platform overhaul to date that took over a year to develop. With advances in AI infused across the platform, Kokai helps marketers optimize ad campaigns across all channels by focusing on audiences first – using data about their most loyal customers to find and build new customer relationships. With Mr. Green's vision for Kokai, we are helping programmatic traders rethink how they approach digital ad campaigns, optimizing the value of their campaign dollars.

86.     The 2024 Proxy Statement was false and misleading because it failed to disclose materially adverse facts about Kokai, *inter alia*, that: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

87.    The 2024 Proxy Statement is further problematic because by the Individual Defendants' own admission, the Company was battling shareholder derivative lawsuits at the same time the Individual Defendants were soliciting reincorporation to Nevada. As detailed herein, the Individual Defendants were engaged in illicit insider trading and company repurchases while simultaneously soliciting shareholders to reincorporate the Company into a jurisdiction that would supposedly exculpate them.

88.    In other words, the Individual Defendants artificially increased the Company's stock value by purposefully withholding materially adverse facts about Kokai. The Individual Defendants then used same artificially increased stock value to induce the shareholders into giving them further benefits by way of increased protection from their illicit activities during the Relevant Period.

89.    On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release revealed that the Company had revenue of $628 million for the third quarter of 2024, representing accelerated growth of 27%. The 3Q24 Earnings Release also provided fourth quarter revenue guidance of $756 million. Defendant Green was quoted in the 3Q24 Earnings Release as stating:

> The Trade Desk delivered strong performance in the third quarter, with revenue of $628 million, accelerating growth to 27%. This performance underlines the value that advertisers are placing on precision and transparency as they work with us to maximize the impact of their campaigns[.] ***As we enter our busiest time of year and look ahead to 2025, we have never been in a better position to capture greater share of the $1 trillion advertising TAM***. 2024 has been a banner year for CTV. Many of the largest media companies are now working with us to help clients capture the full value of CTV advertising via programmatic. We are similarly excited about the momentum in retail media and the pace of adoption by advertisers who are taking advantage of our retail data marketplace. ***And the performance improvements that our clients are seeing with Kokai - our***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*largest platform upgrade to date - showcase the value of audience-driven, AI-enabled innovation.*

(Emphasis added).

90.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Green assured investors that Kokai was performing well, stating, "[w]e are already seeing the results of Kokai performance today, but we're just getting started." Defendant Schenkein also touted Kokai's role in the Company's growth during the 3Q24 Earnings Call, stating, in relevant part, "[k]ey investment initiatives, including performance advancements in our Kokai platform . . . are not only strengthening our foundation, but position us for durable growth in 2025 and beyond."

91.     During the question and answer portion of the 3Q24 Earnings Call, an analyst asked Defendant Green "I guess what type of work does it take to help CMOs and the users understand the metrics coming out of Kokai but also to kind of gain trust around them? I know that's been a challenge in some other walled garden platforms, so people trusting the attribution data." In response, Defendant Green stated, in relevant part:

I really appreciate the question because ***I think this is one of the more nuanced ways that we have just so much opportunity in front of us. . . .***

But the state of measurement is that walled gardens have essentially been grading their own homework for many, many years. And one of the things that they've done really well is convinced people to use their own metrics and kept things quite simple. But at times, that's been really difficult for some of the biggest brands in the world because they'll be told by a walled garden, we help you sell 101 toothbrushes, when the company actually only sold 100 toothbrushes total. So, when you have that phenomenon, you start to doubt the credibility of those metrics.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We have a very different dilemma or challenge, which is that we've been sharing so much data with them and given them so many options about the way to attribute success and attribute sales we've overwhelmed them with complexity and with numbers and there are so many different ways for us to answer those questions. . . .

So, *I'm very optimistic about what that means for the future* because I do think there is a very important principle that we have been saying since the day we went public, which is objectivity matters a lot today, but it will matter more tomorrow, and it will matter more the day after that. *And as time marches on, we think that that continues to be one of our greatest strategic advantages over the biggest names in tech.*

(Emphasis added).

92.    The statements detailed above were materially false and misleading when made because they failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

93.    The truth was revealed on February 12, 2025, when the Company issued the 4Q24 Earnings Release. In the 4Q24 Earnings Release, the Company revealed that Trade Desk's revenue for the fourth quarter of 2024 was $741 million, which was $15 million below the Company's previously provided guidance of $756 million, and $18.8 million below analysts' estimates of $759.8 million. The 4Q24 Earnings Release also revealed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that the Company's revenue guidance for the first quarter of 2025 was at least $575 million, which was approximately $6 million below analysts' estimates of $581.5 million.

94.    On the same day, during the 4Q24 Earnings Call, Defendant Green revealed that the Company had not yet reached a full adoption of Kokai, stating that while the Company was moving 100% of its clients over to Kokai, that "today, [the Company is] maintaining 2 systems, Solimar and Kokai." Defendant Green stated that maintaining the two systems "slows us down."

95.    Additionally, during the question and answer portion of the 4Q24 Earnings Call, Defendant Green revealed that "Kokai rolled out slower than we anticipated," and that "in some cases, the slower Kokai rollout was deliberate."

96.    On this news, Trade Desk's stock price fell $40.31 per share, or nearly 33%, from a closing price of $122.23 per share on February 12, 2025, to a closing price of $81.92 per share on February 13, 2025.

***Insider Sales***

97.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson sold substantial amounts of Company common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

98.    While the Company's stock price was artificially inflated, Defendant Green sold approximately 1.5 million shares of Trade Desk common stock, totaling proceeds of approximately $166,019,977.22. Defendant Green made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Gross Proceeds |
| --- | --- | --- | --- |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| 8/22/2024 | 135,922 | $103.72 | $14,097,829.84 |
| 8/26/2024 | 283,429 | $104.20 | $29,533,301.80 |
| 9/20/2024 | 200,000 | $109.47 | $21,894,000 |
| 9/23/2024 | 200,000 | $108.68 | $21,736,000 |
| 9/25/2024 | 200,000 | $110.54 | $22,108,000 |
| 10/4/2024 | 200,000 | $112.96 | $22,592,000 |
| 10/7/2024 | 200,000 | $112.30 | $22,460,000 |
| 10/9/2024 | 80,649 | $115.50 | $9,314,959.50 |
| 1/7/2025 | 18,207 | $125.44 | $2,283,886.08 |

99.    While the Company's stock price was artificially inflated, Defendant Schenkein sold approximately 96,835 shares of Trade Desk common stock, totaling proceeds of approximately $9,875,985.80. Defendant Schenkein made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Gross Proceeds |
|---|---|---|---|
| 6/14/2024 | 43,705 | $95.38 | $4,168,582.90 |
| 7/9/2024 | 25,000 | $100.43 | $2,510,750 |
| 8/16/2024 | 3,130 | $99.33 | $310,902.90 |
| 10/9/2024 | 25,000 | $115.43 | $2,885,750 |

100.    While the Company's stock price was artificially inflated, Defendant Rajaram sold approximately 6,480 shares of Trade Desk common stock, totaling proceeds of approximately $677,204.10. Defendant Rajaram made the following sales of Trade Desk stock during the Relevant Period:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Transaction Date | Number of Shares Sold | Average Price Per Share | Gross Proceeds |
|---|---|---|---|
| 6/21/2024 | 2,415 | $97.92 | $236,476.80 |
| 7/22/2024 | 1,355 | $98.37 | $133,291.35 |
| 9/24/2024 | 1,355 | $109.00 | $147,695 |
| 10/21/2024 | 1,355 | $117.89 | $159,740.95 |

101. While the Company's stock price was artificially inflated, Defendant Cunningham sold approximately 1,606 shares of Trade Desk common stock, totaling proceeds of approximately $160,712.42. Defendant Cunningham made the following sale of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Gross Proceeds |
|---|---|---|---|
| 8/15/2024 | 1,606 | $100.07 | $160,712.42 |

102. While the Company's stock price was artificially inflated, Defendant Jacobson sold approximately 9,170 shares of Trade Desk common stock, totaling proceeds of approximately $994,334.88. Defendant Jacobson made the following sales of Trade Desk stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Gross Proceeds |
|---|---|---|---|
| 8/16/2024 | 4,872 | $99.50 | $484,764 |

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 1/28/2025 | 4,298 | $118.56 | $509,570 |

103.   In total, during the Relevant Period, these five Individual Defendants' lucrative insider sales netted combined gross proceeds of approximately $177.7 million.

104.   As a result of these insider sales, Defendants Green, Schenkein, Rajaram, Cunningham, and Jacobson were unjustly enriched.

***Stock Repurchases During the Relevant Period***

105.   According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 978,000 shares of its own stock, for a total expenditure of approximately $110,491,950 million during the Relevant Period.

106.   According to the Company's public filings, Trade Desk made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Numbers of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| August 1 – August 31, 2024 | 117,000 | $103.74 | $12,137,580 |
| September 1 – September 30, 2024 | 400,000 | $104.39 | $41,756,000 |
| October 1 – October 31, 2024 | 214,000 | $115.26 | $24,665,640 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| November 1 – November 30, 2024 | 38,000 | $128.91 | $4,898,580 |
| December 1 – December 21, 2024 | 209,000 | $129.35 | $27,034,150 |

107.  Given that the price of Trade Desk stock was $81.92 per share on February 13, 2025, after the corrective disclosures, the true value of the 978,000 repurchased shares was roughly $80,117,760. Accordingly, the Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase these shares during the Relevant Period.

***Harm to the Company***

108.  As a direct and proximate result of the Individual Defendants' misconduct, Trade Desk has lost and expended, and will lose and expend, millions of dollars.

109.  Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Green and Schenkein, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

110.  Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

111.  Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

112.   Additionally, during the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

113.   Plaintiff brings this action derivatively in the right of and for the benefit of Trade Desk to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

114.   Trade Desk is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

115.   Plaintiff is an owner of Trade Desk stock and has been a continuous shareholder of Company stock at all relevant times.

116.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

117.   The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

118.   The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

119.   The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

120.    On May 30, 2025, Plaintiff, through Plaintiff's counsel, sent a demand on Trade Desk's Board to investigate the violations of law described herein and to pursue litigation against the Individual Defendants for breaching their fiduciary duties by allowing Trade Desk to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

121.    The Demand outlined alleged false and misleading statements or omissions made during the Relevant Period, detailed therein, that there were: (i) undisclosed issues with the rollout of Kokai; (ii) those issues prevented the rollout of Kokai; and (iii) The delayed Kokai rollout forced the Company to operate both Kokai and the legacy Solimar system in parallel.

122.    The Demand further outlined the series of insider transactions perpetrated by Defendants Green, Schenkein, Jacobson, Rajaram, and Cunningham that occurred between June 2024 and January 2025. The Demand also outlined the Company's series of stock repurchases from August 2024 to December 2024, while Trade Desk's stock was artificially inflated.

123.    On August 4, 2025, Plaintiff received a letter on behalf of the Board acknowledging receipt of the Demand (the "Demand Refusal Letter"). The Demand Refusal Letter further stated that the Board had concluded that resolution of Plaintiff's demand would be premature and instead chose "defer action on the Litigation Demands until the underlying Class Action further progresses." The Demand Refusal Letter is attached hereto as Exhibit B.

124.    At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Green, Buyer, Cunningham, Falberg, Jacobson, and Rajaram (the "Director Defendants"). The Board also consisted of non-party director Kayyal.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

125.   The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

126.   The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the company neglected to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

127.   The Demand Refusal Letter asserts that the Board's refusal of the demand is reasonable, citing, *inter alia*, the ongoing nature of the Securities Class Action as sufficient cause to refuse the demand. The Demand Refusal Letter does not, however, contain any evaluation of the merits of the Demand, nor does it communicate the Board's conclusions regarding the merits of the Demand.

128.   The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them. Given this lack of good faith, the Board's deferral of consideration of the Demand constitutes a constructive refusal of the Demand.

129.   The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information by plainly disregarding the merits of the claims and allegations in the Demand.

For the foregoing reasons, the Board's refusal of the Demand falls outside of the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Trade Desk.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I

*Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9)*

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

132.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

133.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

134.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

135.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Proxy Statement filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the value of Kokai to the Company. Specifically, the 2024 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

136.    The misrepresentations and omissions in the 2024 Proxy Statement were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2024 Proxy Statement, including, but not limited to, the approval of the reincorporation of Trade Desk from the State of Delaware to the State of Nevada by conversion.

137.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

138.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

## COUNT II

***Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)***

139.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Trade Desk. Not only is Trade Desk now defending claims that it

37

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Trade Desk by the Individual Defendants.

141.   During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $30.3 million to repurchase approximately 978,000 shares of Trade Desk common stock.

142.   The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

143.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Trade Desk not misleading.

144.   The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Trade Desk.

145.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

146.   The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $110 million in the repurchase of Trade Desk stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

147.   By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

148.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

149.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Trade Desk stock at prices artificially inflated by those materially false and misleading statements.

151.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT IV

### *Against the Individual Defendants for Breach of Fiduciary Duty*

152.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

154.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

155.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

156.   Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company was experiencing significant challenges in rolling out Kokai, including challenges with transitioning clients from Solimar to Kokai; (ii) these execution challenges resulted in the delay of the full rollout of Kokai; (iii) the Company's inability to fully rollout Kokai negatively impacted the Company's business, operations, and financial prospects; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

157.   Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

158.   Furthermore, five of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

159.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

160.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

161.   Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT V

### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

164.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT VI

### *Against the Individual Defendants for Unjust Enrichment*

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Trade Desk.

167.    Plaintiff, as a shareholder and a representative of Trade Desk, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

168.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT VII

### *Against the Individual Defendants for Abuse of Control*

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

171.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

172.    Plaintiff, on behalf of Trade Desk, has no adequate remedy at law.

## COUNT VIII

### *Against the Individual Defendants for Waste of Corporate Assets*

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

175.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase over 900,000 shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

176.    Additionally, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

177.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company

178.    Plaintiff, on behalf Trade Desk, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2026                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

   I, Hugues Gervat am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

2/16/2026

DocuSigned by:

**Hugues Gervat** _____

2F6AF3BA1AB040E...

Hugues Gervat

# Exhibit A



## The Rosen Law Firm
### I N V E S T O R   C O U N S E L

May 30, 2025                                                        Phillip Kim
                                                                    philkim@rosenlegal.com

**VIA FEDEX**
Jeff T. Green
Chair of the Board
The Trade Desk, Inc.
42 N. Chestnut Street
Ventura, CA 93001

Re:     **Shareholder Litigation Demand on The Trade Desk, Inc.'s Board of Directors**

Dear Mr. Green,

    We write on behalf of Huges Gervat (the "Shareholder"), who has continuously held shares of The Trade Desk, Inc. ("Trade Desk" or the "Company") at all relevant times and intends to retain ownership throughout the course of this litigation.

    As set forth in greater detail below, this letter constitutes the Stockholder's demand that the Company's Board of Directors (the "Board") promptly and thoroughly investigate the misconduct described herein and take all necessary and appropriate action, including, without limitation, initiating legal proceedings for breaches of fiduciary duty, corporate mismanagement, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934, and other related misconduct against the following current and/or former officers and directors of the Company: Laura Schenkein ("Schenkein"), Lisa J. Buyer ("Buyer"), Andrea L. Cunningham ("Cunningham"), Kathryn E. Falberg ("Falberg"), Gokul Rajaram ("Rajaram"), David B. Wells ("Wells"), Samantha Jacobsen ("Jacobsen"), and the recipient of this letter, Jeff T. Green ("Green" or "you") (collectively, the "Officers and Directors").

    As officers and directors, the named individuals owed fiduciary duties of good faith, loyalty, and due care to Trade Desk and its stockholders. These duties required them to act honestly and lawfully, to remain informed regarding the Company's operations, to oversee management responsibly, and to ensure accurate disclosures. These obligations were reinforced by the Company's Code of Conduct and by the responsibilities outlined in the Company's Audit Committee Charter, both of which impose high ethical and professional standards.

    As outlined below, the Shareholder believes that the Officers and Directors violated these duties, aided and abetted such breaches, and/or were unjustly enriched at the Company's expense.

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

Accordingly, the Board must promptly and thoroughly investigate these matters and initiate legal action as necessary to recover damages and obtain appropriate restitution. The Shareholder also urges the Board to adopt meaningful governance reforms to prevent further harm and rebuild stockholder confidence. Additionally, the Board must ensure that any conflicts of interest are fully addressed during its review.

The Stockholder reserves the right to supplement this demand as additional information becomes available.

## I.   FACTUAL BACKGROUND

As you know, Trade Desk is a Nevada corporation headquartered in Ventura, California, with operations spanning North America, Europe, and the Asia-Pacific region. Its common stock trades on the NASDAQ under the ticker symbol "TTD."

Founded in 2009, the Company has grown into a global leader in advertising technology, offering a self-service, cloud-based platform that enables advertisers to plan, manage, optimize, and measure data-driven digital campaigns. The platform supports programmatic advertising across a wide range of formats—including connected TV (CTV), online video, display, audio, and native—and across multiple devices such as smart TVs, streaming devices, mobile phones, tablets, and desktop computers.

The platform operates through a real-time bidding system, similar to a stock exchange, allowing advertisers to bid on individual ad impressions as they become available. Clients can define audience segments, upload creative content, incorporate first-party data to build custom audiences, and choose from various inventory sources to activate campaigns. Advertisers may set floor and ceiling bid thresholds, with the platform's algorithms optimizing bids within those parameters.

The Trade Desk primarily generates revenue through a fixed fee based on a percentage of clients' total ad spend. For managed service campaigns—where the company executes campaigns on behalf of clients—it charges additional fees. The company also earns high-margin revenue through optional "fee features," which are tools designed to enhance campaign performance.

In June 2023, the Company announced the launch of "Kokai," a generative AI-powered platform it described as a transformative advancement in programmatic advertising. In the initial press release and a series of subsequent public statements, Trade Desk repeatedly praised Kokai's capabilities—including predictive clearing, real-time bid optimization, impression relevance scoring, advanced forecasting, identifier resilience, and KPI-based performance measurement. The Company asserted that Kokai could process over 13 million ad impressions per second, promising advertisers greater efficiency and improved return on ad spend. Founder, Chairman, and Chief Executive Officer ("CEO") Green characterized Kokai as the "largest platform overhaul in our company's history" and assured stockholders that the transition from its legacy platform, Solimar, would be seamless and fully completed by the end of 2024.

2

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

On May 8, 2024, Trade Desk reported $491 million in first quarter 2024 revenue, reflecting a 28% year-over-year increase. The Company attributed this growth in part to the capabilities and adoption of Kokai. Throughout the remainder of 2024 and into early 2025, Trade Desk consistently communicated to investors that the platform was performing as expected and meeting its objectives. The Company did not disclose any significant challenges with the migration to Kokai and continued to affirm that the rollout was progressing smoothly.

This narrative abruptly changed on February 12, 2025, when the Company released its fourth quarter and full-year 2024 results, falling short of both internal guidance and market expectations. Fourth quarter 2024 revenue totaled $741 million—$15 million below guidance and roughly $19 million below consensus. The Company's first quarter 2025 guidance of $575 million likewise disappointed investors.

During the accompanying earnings call, executives revealed for the first time that the transition to Kokai had been significantly delayed and more problematic than previously disclosed. Contrary to prior statements, the Company was still operating both Kokai and Solimar in parallel— a dual-system setup that introduced unexpected operational inefficiencies and diluted the benefits Kokai was meant to deliver. Management further admitted to deliberately slowing the rollout due to persistent technical and usability issues, directly contradicting earlier and repeated claims of a smooth and timely migration.

In response to this disclosure, Trade Desk's stock price dropped nearly 33% in a single trading day—from $122.23 on February 12, 2025, to $81.92 on February 13, 2025—on unusually high trading volume.

\*       \*       \*

*The False and Misleading Statements*

*May 8, 2024, Earnings Release.*  On May 8, 2024, following the close of markets, Trade Desk issued a press release announcing its financial results for the first quarter of 2024. The Company reported $491 million in revenue for the quarter, representing a 28% year-over-year increase. CEO Green highlighted the Company's strong performance, stating: "Q1 was a strong quarter for Trade Desk as we delivered revenue of $491 million, accelerating growth to 28% year-over-year." CEO Green attributed the Company's momentum not only to the ongoing shift toward Connected TV, the growing adoption of UID2, and the expansion of first-party and retail data, but also to "significant AI advances in our Kokai platform." He emphasized that Kokai's AI-driven innovations are enabling advertisers to make faster, more data-driven decisions and improve ROI, thereby enhancing the Company's ability to deliver premium value and gain market share across the open internet.

*May 8, 2024 Earnings Call.* That same day, during the Company's earnings call for investors and analysts, CEO Green repeatedly attributed Trade Desk's revenue growth to the Kokai platform. He stated:

3

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

> I believe our revenue growth acceleration in the first quarter speaks to the innovation and value that we are delivering to our clients with Kokai... The innovations in our Kokai platform will help our clients take advantage of this revaluation and fully leverage data-driven buying to fuel their own business growth. As a result, I've never been more optimistic about the future of the Open Internet and our ability to gain more than our fair share of the nearly $1 trillion advertising TAM [total addressable market].

Green further emphasized what he characterized as a smooth and impactful rollout of Kokai:

> As a reminder, last year on 06/06, we started shipping Kokai. This platform launch is different for us because 06/06 last year marked just the beginning, and we've been shipping new features ever since. We are quickly approaching some of the biggest UX and product rollouts of Kokai that nearly all of our customers will begin to use and see benefits from over the next few quarters, including a game-changing AI-fueled forecasting tool.

Green's remarks portrayed Kokai as a critical innovation that was already generating significant value and poised to deliver even greater benefits in the near term.

On the same call, Chief Financial Officer ("CFO") Schenkein highlighted Kokai's role in driving results. Schenkein stated: "All of our progress in areas such as CTV, Retail Media, Kokai and UID2 helped deliver another quarter of consistently strong growth and profitability to start 2024." She further emphasized Kokai's central role in the Company's strategic roadmap: "We're executing on large long-term growth drivers, including CTV, international expansion, retail media, our recent platform upgrade in Kokai, UID2, as well as the upcoming US election cycle."

In response to an analyst question regarding potential competition from Amazon's demand-side platform ("DSP"), CEO Green downplayed the risk, citing what he portrayed as Trade Desk's structural advantages and openness:

> Until [Amazon] embraces the Open Internet and common currency—so advertisers can bring their own data to bear—I actually don't think they're that competitive... I think the premium supply doesn't have quite as much of a surplus as there could be if Amazon embraced that, and I think we're going to see it take a little while before we get there.

He continued:

> Advertisers want a competitive market with price discovery because they want to own their own future. It is easier than ever for advertisers to understand who is delivering value at all points of the digital advertising supply chain. And they will increasingly gravitate to those who are helping them make the most of every advertising dollar with transparency and objectivity. Of course, this is all made possible by our profitable business model, which generates significant cash flow,

4

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

which in turn allows us to invest in the major platform upgrades that characterize Kokai.

CEO Green concluded with a highly favorable outlook, stating:

So while I believe 2024 will be remembered as a year of great tech-driven disruption in our industry, I also believe it is a year that Trade Desk will continue to differentiate itself from its competitors and continue to outpace the market. As the industry races toward $1 trillion TAM, we are incredibly well-positioned to take more than our fair share.

*May 10, 2024 Form 10-Q.*  Two days later, on May 10, 2024, Trade Desk filed its quarterly report on Form 10-Q with the Securities and Exchange Commission ("SEC") for the first quarter of fiscal year 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by CFO Schenkein and included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act, as well as the Sarbanes-Oxley Act of 2002 ("SOX"). These certifications attested that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

In discussing the updates made to the Kokai platform, the Q1 2024 10-Q emphasized the Company's belief that the improvements would significantly enhance its competitive position, stating:

Our platform system applications are complex, multi-faceted, and include applications that are highly customized in order to serve and support our clients, advertising inventory and data suppliers, as well as support our financial reporting obligations. We regularly make improvements to our platform to maintain and enhance our competitive position.

Despite the boilerplate risk factors noted in the Q1 2024 10-Q, it failed to address the actual risks that had materialized due to the challenges in the rollout of the Kokai platform. While the Company highlighted the updates and improvements, it neglected to disclose that the rollout was not progressing smoothly, there was more competition for market share than anticipated, and these issues posed real and immediate risks to its business operations.

*May 17, 2024 LUMA Partners' Digital Summit.* On May 17, 2024, Trade Desk's Chief Strategy Officer ("CSO"), Jacobson, represented the Company at the LUMA Partners' Digital Media Summit. During her remarks, Jacobson emphasized the success and capabilities of Kokai, noting its growing adoption and competitive advantage in the market. Jacobson stated that, "In the past few weeks, we've announced expansions in our partnerships with Disney, Roku, and LG. Many more are embracing programmatic advertising because of the results it delivers for advertisers."

CSO Jacobson went on to highlight Kokai's core features, such as the "Sellers and Publishers 500 Plus," which provides advertisers with seamless access to high-quality inventory

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

across the open internet in a transparent, brand-suitable manner. She further emphasized the platform's value, stating, "We believe in transparency and giving our advertisers choice, but we also recognize the value of AI. That's why we've integrated Kokai to allow advertisers to leverage first-party data assets, retail assets, and third-party offerings, enriched with AI to optimize campaigns." Jacobson concluded by stressing the importance of transparency and accountability: "Machine learning and AI are essential, but they can't replace transparency and trust. That's why we provide event-level data, work with third-party providers, and give advertisers access to their own data for deeper analysis and integration."

*June 28, 2024 Company Recap Article.* On June 28, 2024, Trade Desk released a recap article titled "Traders tout how Kokai is driving campaign success," celebrating the one-year anniversary of Kokai's launch and its successful rollout. The article emphasized Kokai's performance improvements, which were reflected in beta campaign results, including a 24% decrease in cost per unique reach, a 36% reduction in cost per click (CPC), and a 34% drop in cost per action (CPA). The article highlighted how Kokai's new user interface has been well received by users, with traders (aka users) praising the platform's ability to streamline campaign setup and reporting. The platform's AI capabilities, which allow for more precise bid decisions and improved relevance scoring, were cited as key differentiators driving its adoption. Several users shared positive experiences, noting the platform's efficiency in simplifying decision-making and providing valuable insights, such as easy access to frequency distribution data and the ability to assess campaign relevance before launch.

*August 8, 2024 Earnings Release.* On August 8, 2024, after the markets closed, Trade Desk issued a press release announcing its financial results for the second quarter of 2024, reporting $585 million in revenue, which represented a 26% year-over-year increase. In the press release, CEO Green attributed this growth, in part, to the continued rollout of Kokai, the Company's newest and "most ambitious platform to date." Green stated:

> We've made significant strides in CTV, retail media and identity, empowering the world's largest brands to buy premium media on the open internet with unprecedented agility and precision. As Kokai ramps, we're intuitively surfacing value for advertisers, integrating data into every decision, advancing the full power of AI as a co-pilot, and enabling advertisers to maximize the potential of their first party data. With ongoing innovations in Kokai, the widespread adoption of UID2, and the expanding use of retail data, we will continue to deliver exceptional value to advertisers and grow our leadership in key high growth markets such as CTV.

*August 8, 2024 Earnings Call.* During the second-quarter earnings call, CEO Green highlighted the significant role that the newly launched platform, Kokai, is playing in driving Trade Desk's growth. He emphasized Kokai's capabilities in enabling advertisers to leverage first-party data and identify new loyal customers across the open internet. Green stated:

> In order to help advertisers think about efficacy in new ways and to help them take advantage of the premium Open Internet where consumers are most leaned in, after years of development, we launched our most ambitious platform to date, Kokai.

6

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

Kokai allows our clients to deploy data about their most loyal customers and then use that data as a seed to grow and harvest the next generation of loyal customers.

Further underscoring Kokai's early success, Green stated:

I've been incredibly encouraged by the early results from Kokai. For those campaigns that have moved from Solimar to Kokai, in aggregate, incremental reach is up more than 70%, cost per acquisition has improved by about 27%, and data elements per impression have increased by approximately 30%. In addition, performance metrics have improved by about 25%, helping to unlock performance budgets on our platform for years to come.

Green continued to stress the strategic importance of Kokai in addressing the challenges that chief marketing officers ("CMOs") face in a rapidly evolving market: "Given everything I said about what CMOs today are trying to accomplish and the pressures that they are under, I firmly believe that we have met the moment with Kokai."

CFO Schenkein also recognized the importance of Kokai in driving the company's long-term growth. In her closing remarks, Schenkein pointed to Kokai as a key growth driver for the company, alongside other important strategic areas such as CTV, retail media, and international expansion:

We are extremely pleased with our strong performance in the second quarter and throughout the first half of the year. The opportunity ahead of us has never been more promising. We are positioned within a large and expanding market, supported by a business model that consistently delivers robust top-line growth, significant profitability, and strong cash flow. With key growth drivers such as CTV, retail media, international expansion, a strong identity strategy, and a major product upgrade with Kokai, we remain confident and optimistic about our future as we navigate the second half of this year and look forward to 2025 and beyond.

These statements from Green and Schenkein paint a picture of Kokai as a transformative platform that is actively driving significant improvements in advertiser performance and positioning Trade Desk for continued success in the market.

*August 8, 2024 Form 10-Q.* Also on August 8, 2024, Trade Desk filed its quarterly report on Form 10-Q with the SEC for the second quarter of fiscal year 2024 ("Q2 2024 10-Q"). The report was signed by CFO Schenkein and included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act, as well as SOX certifications. These certifications attested that the Q22024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

The Q2 2024 10-Q highlighted the Company's belief that updates to the Kokai platform would strengthen its competitive position, noting: "Our platform system applications are complex, multi-faceted, and highly customized to support clients, inventory, data suppliers, and financial

7

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

reporting. We regularly improve our platform to maintain and enhance our competitive position." However, despite listing general risk factors, the Q2 2024 10-Q did not address the actual risks that emerged from the challenges in Kokai's rollout.

*October 3, 2024 Proxy Statement.* On October 3, 2024, Trade Desk filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). By way of the 2024 Proxy Statement, Green, Buyer, Cunningham, Falberg, Jacobson, Rajaram, and Wells successfully solicited shareholder approval for a significant corporate restructuring involving a reincorporation from Delaware to Nevada.

The 2024 Proxy Statement highlighted Kokai's central role in the Company's strategy and future growth. However, it notably failed to address any challenges related to the transition of clients from its previous platform, Solimar, to Kokai. Despite the difficulties that were reportedly encountered during the rollout, the 2024 Proxy Statement emphasized Kokai's transformative impact on Trade Desk's operations, stating:

> In 2023, we announced the launch of Kokai, our largest core platform overhaul to date that took over a year to develop. With advances in AI infused across the platform, Kokai helps marketers optimize ad campaigns across all channels by focusing on audiences first—using data about their most loyal customers to find and build new customer relationships. With Mr. Green's vision for Kokai, we are helping programmatic traders rethink how they approach digital ad campaigns, optimizing the value of their campaign dollars.

*November 7, 2024 Earnings Release.* On November 7, 2024, Trade Desk issued a press release announcing its financial results for the third quarter of 2024, reporting revenue of $628 million—reflecting an accelerated growth rate of 27%. The Company also issued guidance for the fourth quarter of 2024, projecting revenue of "at least $756 million" and adjusted EBITDA of approximately $363 million. In the press release, CEO Green stated: As we enter our busiest time of year and look ahead to 2025, we have never been in a better position to capture greater share of the $1 trillion advertising TAM." Green further emphasized that the Company's "performance improvements that our clients are seeing with Kokai—our largest platform upgrade to date—showcase the value of audience-driven, AI-enabled innovation."

*November 7, 2024 Earnings Call.* During the Company's related earnings call for the third quarter of 2024, CEO Green reiterated that, "We are already seeing the results of Kokai performance today, but we're just getting started."

CFO Schenkein echoed this optimism, claiming: "Key investment initiatives, including performance advancements in our Kokai platform… are not only strengthening our foundation, but position us for durable growth in 2025 and beyond."

During the question and answer portion of the earnings call, CEO Green emphasized the significant success of Kokai, noting that the platform's adoption had far surpassed expectations. He remarked that "the adoption has been phenomenal" and described it as "the best product we've ever shipped." Green highlighted Kokai's central role in the company's performance, stressing its

8

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

importance to Trade Desk's continued growth and innovation. He stated, "We are in a stronger position than we have ever been," attributing much of this success to Kokai. Green further emphasized that Kokai's launch was not only a technical achievement but also a key driver in sales and client service efforts, allowing the company to operate at peak performance. He underscored that the platform was now integral to Trade Desk's ability to maintain and expand its market leadership.

*     *     *

*The Truth is Revealed*

*February 12, 2025 Earnings Release.* The truth regarding the challenges with Trade Desk's Kokai platform rollout came to light on February 12, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year of 2024. Trade Desk reported fourth-quarter revenue of $741 million, falling short of its prior guidance of at least $756 million and below analysts' expectations of $759.8 million. Additionally, the Company provided disappointing guidance of at least $575 million for the first quarter of 2025, which also missed consensus estimates of $581.5 million. In the press release, Green acknowledged, "[W]e are disappointed that we fell short of our own expectation in the fourth quarter."

*February 12, 2025 Earnings Call.* During the related earnings call, Green attributed the revenue miss to "a series of small execution mistakes," which included the Kokai rollout that had "rolled out slower than we anticipated." While Green attempted to frame the delay as "in some cases… deliberate," his comments, along with the market's reaction, revealed mounting concerns about the Company's execution and internal disorganization. Green explained that Trade Desk was still operating both Kokai and its predecessor, Solimar, which was "slowing us down." He further disclosed that while the majority of clients had been moved to Kokai, the full migration was not yet complete, stating, "We'll move 100% of our clients to Kokai this year." Notably, Green admitted that the Company had failed to meet its internal goal of 50% Kokai adoption by the end of 2024.

In a convoluted effort to reassure investors and excuse the disappointing earnings, Green focused on what he called the "largest reorganization in company history," which took place in December 2024. He framed these changes as necessary structural adjustments designed to accelerate growth and operational effectiveness. These included streamlining client-facing teams, clarifying roles and reporting lines, emphasizing scalability, focusing more on brand-direct relationships, and overhauling the product development process by implementing smaller, agile "scrum teams" to facilitate faster enhancements to Kokai. However, Green's comments during the earnings call revealed that the restructuring was, in fact, a direct response to significant challenges with the Kokai rollout. He acknowledged that despite the Company's ambition to migrate all clients to Kokai, the Company was still operating with two systems—Solimar and Kokai—which "slows us down." Green further disclosed that the Company had stumbled in Q4 due to "a series of small execution missteps" while simultaneously preparing for future growth, underscoring that these issues were not related to competition or the size of the opportunity, but rather to internal operational struggles.

9

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

Green emphasized the scale of the restructuring, stating, "We've made four major changes at The Trade Desk in the last few months," underscoring that the restructuring was a critical effort to recalibrate the company. He went on to say, "We did the largest reorganization in company history in December," marking the initiative as part of an ongoing effort to recalibrate the company for future success. He added, "This wasn't just a standard change. It was bigger than usual," and pointed to a series of internal changes that were implemented to overcome the complications of the Kokai rollout, including the creation of smaller, more agile teams within the product development department. He also noted the Company's enhanced focus on brand-direct relationships, which was a shift aimed at improving Kokai's market position.

Moreover, in the question and answer portion of the earnings call, Green further acknowledged the slower-than-expected rollout of Kokai, explaining that it was partly a deliberate decision: "The slower Kokai rollout was deliberate... a quicker rollout would result in more short-term spend, and we don't always build what the customers want." This insight illustrates that the restructuring was directly tied to the need to address the slow and problematic deployment of Kokai, with management taking steps to correct course and ensure long-term success.

These revelations regarding the challenges with Kokai's rollout starkly contrast with the narrative presented by Trade Desk throughout 2023-2024, representing a significant deviation from the Company's messaging. As detailed above, during this period, executives consistently portrayed Kokai as a highly successful platform, emphasizing its rapid adoption, transformative capabilities, and critical role in the Company's growth. They highlighted Kokai's advanced AI and market penetration, asserting that it would position Trade Desk as a leader in the digital advertising space, significantly boost revenue growth, and strengthen client relationships.

Internally, however, Trade Desk was fully aware of the substantial challenges behind the scenes. The Company faced significant difficulties transitioning clients from its previous platform, Solimar, to Kokai and, in fact, intentionally slowed Kokai's rollout to address unforeseen complications. Additionally, the engineering and sales teams were not adequately equipped to support the platform's rollout, further exacerbating these challenges. Moreover, the Company was also experiencing competition from Amazon and other platforms that detracted from the Company's market share. These internal issues resulted in delays and hindered the Company's ability to meet client needs, directly impacting Kokai's adoption and performance. Consequently, the Company struggled with execution, leading to delays that negatively affected revenue growth.

Despite the Company's attempts to reassure the market, analysts swiftly downgraded the stock and expressed skepticism about Trade Desk's performance and competitive positioning. Wedbush Securities, in a report titled "Debacle Leads To Doghouse," cited the delayed rollout of Kokai and other execution issues as contributing to the revenue miss. Cantor Fitzgerald similarly noted that missing the Company's 50% Kokai adoption goal weighed on fourth quarter 2024 results. William Blair highlighted that maintaining both Kokai and Solimar continued to burden operational efficiency. Analysts at RBC Capital Markets and Needham & Co. raised concerns about increased competition, with channel checks indicating that rival demand-side platforms (DSPs) had been winning business away from Trade Desk starting in the second half of 2024.

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10116 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

The market's reaction was swift and sharp, confirming that this information was material and previously unknown. The Company's stock price declined $40.31 per share, or more than 32%, from a closing price of $122.23 per share on February 12, 2025, to $81.92 per share on February 13, 2025, inflicting significant losses on investors and damaging the Company's reputation.

*       *       *

*Insider Trading*. The troubling issue of insider trading exacerbates the failures surrounding Trade Desk's financial practices. Specifically, while the Company continued to publicly tout Kokai as a successful, game-changing platform, senior insiders—including CEO Green, CFO Schenkein, CSO Jacobson, and Board members Rajaram and Cunningham— quietly sold off substantial portions of their personal holdings in Company stock—reaping approximately $177.7 million in proceeds between June 2024 and January 2025.

- CEO Green sold approximately 1.52 million shares, with these sales occurring in multiple transactions over several months, including significant sales in late August and early October 2024, and the highest share price of $125.44 on January 7, 2025, netting roughly $166 million in proceeds.
- CFO Schenkein sold 96,835 shares, with her transactions occurring between June and October 2024, including a sale on October 9, 2024, at $115.43 per share, yielding approximately $9.88 million in proceeds.
- CSO Jacobson sold 9,170 shares, with notable sales on August 16, 2024, and January 28, 2025, at average prices of $99.50 and $118.56 per share, bringing in about $994,335 in proceeds.
- Board member Rajaram also engaged in insider sales, unloading 6,480 shares between June and October 2024, with the last sale on October 21, 2024, at $117.89 per share, generating about $677,204 in proceeds.
- Board member Cunningham sold 1,606 shares on August 15, 2024, at $100.07 per share, for approximately $160,712 in proceeds.

These sales, executed while the executives were privy to adverse material nonpublic information, allowed them to unjustly enrich themselves at the direct expense of the Company and its shareholders.

*Company Stock Repurchases at Inflated Prices*

During the period between August 1, 2024, and December 31, 2024, the Officers and Directors authorized the Company to repurchase approximately 978,000 shares of its own stock at inflated prices, at a total approximate cost of $110.5 million. These buybacks occurred at prices significantly higher than the Company's true value, as evidenced by the closing stock price of $81.92 per share on February 13, 2025, following corrective disclosures.

For example, in August 2024, 117,000 shares were repurchased at an average price of $103.74, resulting in an overpayment of $2.55 million compared to the true value. In September 2024, 400,000 shares were repurchased at an average price of $104.39, leading to an overpayment

11

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

of $8.99 million. In October 2024, 214,000 shares were repurchased at $115.26, which caused an overpayment of $7.14 million. In November 2024, 38,000 shares were repurchased at $128.91, resulting in an overpayment of $1.79 million. Finally, in December 2024, 209,000 shares were repurchased at $129.35, leading to an additional $9.91 million overpayment.

Altogether, the total overpayment for these stock buybacks amounted to $30.4 million. These buybacks, executed without disclosing the underlying issues with the Kokai rollout, helped maintain the false impression that the business was performing as represented. In essence, the Company overpaid for its own shares, reinforcing the misleading narrative and causing a direct financial loss to both the corporate treasury and shareholders.

*        *        *

*Damages Sustained by the Company*. As a direct and foreseeable consequence of the misconduct by certain officers and directors, Trade Desk has suffered—and continues to suffer—significant harm.

Significantly, the Company is currently a named defendant in multiple federal securities class actions and related derivative actions. It now faces the prospect of substantial monetary liability, in addition to the considerable legal fees and costs associated with defending or resolving that action and any related proceedings. These legal exposures have already necessitated the engagement of outside counsel, consultants, and forensic accountants to support both litigation efforts and internal investigations.

Meanwhile, senior executives continued to receive substantial compensation packages—including salaries, bonuses, stock option grants, and other benefits—despite the ongoing misconduct and misrepresentations. These awards, issued during a period marked by serious corporate governance failures, constitute waste of corporate assets and further underscore a troubling lack of accountability and oversight at the highest levels of the Company.

In response to these failures, Trade Desk must now undertake costly efforts to investigate the governance lapses and implement meaningful reforms to mitigate future risk. These expenses, though necessary, represent a direct financial consequence of prior mismanagement.

Additionally, multiple officers and directors sold tens of millions of dollars in Trade Desk stock while in possession of material, nonpublic information. These transactions raise serious concerns about potential insider trading and warrant immediate and thorough investigation.

The Company has also experienced substantial reputational damage. Following adverse disclosures on February 12, 2025, Trade Desk's stock declined more than 32%, reflecting a sharp market reaction to the loss of investor confidence. The Company's credibility has been impaired, its equity now trades at a material discount, and its ability to attract capital, retain personnel, and maintain strategic partnerships has been compromised.

In sum, the cumulative impact of this misconduct has materially harmed the Company's financial condition, operations, and long-term prospects. Without prompt and meaningful

12

Shareholder Demand on Trade Desk, Inc.'s Board of Directors
May 30, 2025

corrective action—including restitution, clawback of improperly awarded compensation, internal governance reforms, and accountability for potential insider trading—these harms will only continue to deepen.

## II  DEMAND

In light of the facts and allegations outlined above, the Shareholder demands that the Board of Directors promptly and thoroughly investigate whether any current or former officers and directors of Trade Desk engaged in breaches of fiduciary duty, gross mismanagement, or other violations of applicable law or Company policy. The investigation must be conducted independently and not be influenced by any individuals potentially implicated in the wrongdoing. Further, the Shareholder demands that the Board commence a civil action against each responsible individual, including, at least, the Officers and Directors, to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties. The Board must also assess whether any third parties should be sued, such as financial advisors, auditors, or attorneys. The Company must also adopt corporate governance improvements immediately. These steps are vital to restoring shareholder confidence and ensuring the Company is governed in a manner that prioritizes long-term value and legal compliance.

Please confirm receipt of this letter and advise of the measures the Board plans to take to address the harm inflicted upon Trade Desk. If the Board does not commence the demanded actions within a reasonable time following receipt of this letter, our client intends to initiate derivative litigation on behalf of the Company.

We remain willing to assist the Board in its investigation and will review and comment on any materials or reports generated in the course of its work.

Should you have any questions, please contact the undersigned counsel. Thank you for your attention to these serious matters.

Very truly yours,

*Phillip Kim*

_____
Phillip Kim

Cc: Erica Stone (estone@rosenlegal.com)
    Luke Foley (lfoley@rosenlegal.com)

THE ROSEN LAW FIRM, P.A. ♦ 275 MADISON AVENUE, 40TH FLOOR ♦ NEW YORK, NY 10116 ♦ TEL: (212) 686-1060 ♦ FAX: (212) 202-3827

# Exhibit B



Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California  94304-1050

O: 650.493.9300
F: 866.974.7329

CAZ HASHEMI
chashemi@wsgr.com
Direct Dial: (650) 320-4827

August 4, 2025

**By Email**
Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue, 40th Floor
New York, NY  10116
philkim@rosenlegal.com

Re:          **Demand on the Board of Directors of The Trade Desk, Inc.**

Dear Phil,

We write on behalf of The Trade Desk, Inc. ("The Trade Desk" or the "Company") regarding the litigation demand made on behalf of Huges Gervat (the "Shareholder"), a purported shareholder of the Company, dated May 30, 2025 (the "Gervat Demand").

Following receipt of the Gervat Demand and our subsequent discussions, the Company's Board of Directors (the "Board") received another related litigation demand based on substantially similar alleged facts and claims (together, the "Litigation Demands").

The Board takes litigation demands seriously.  After receiving the subsequent litigation demand, the Board determined to evaluate the Litigation Demands and determine appropriate next steps.  As we have discussed, the factual bases underlying the Litigation Demands derive primarily from the facts alleged in the consolidated shareholder class action pending in the U.S. District Court for the Central District of California (the "Class Action").  The Class Action remains at an early stage, and developments in the Class Action may impact the Board's evaluation of the Litigation Demands.  Accordingly, the Board determined that the Litigation Demands are premature and that it would be in the best interest of the Company and its shareholders to defer action on the Litigation Demands until the underlying Class Action further progresses.

The Trade Desk reserves all other rights and defenses in response to the Gervat Demand.

**WILSON SONSINI**

Phillip Kim
August 4, 2025
Page 2

Sincerely,

WILSON SONSINI GOODRICH
  & ROSATI, P.C.

*/s/ Caz Hashemi*

Caz Hashemi

cc:    Ben Crosson
       Brad Sorrels
       Luke Foley